HOFFMAN v. WILLITS.

LANDLORD AND TENANT—HOLDING OVER—PRESUMPTION—INTENT.
Where a tenant under a yearly tenancy holds over after
the expiration of his term, the law presumes an intention
by the tenant to continue the yearly tenancy, but such
presumption may be rebutted by showing an agreement
that such holding over should not be so regarded.[1]

Error to Kent; Perkins, J. Submitted October 24,
1916. (Docket No. 50.) Decided December 22, 1916.
Rehearing denied April 19, 1917

Assumpsit in justice's court by Clayton Hoffman
and others against John C. Willits for use and occu-
pation. There was judgment for plaintiffs and de-
fendant appealed to the circuit court. From a judg-
ment for an insufficient amount, plaintiffs bring error.
Affirmed.

*A. C. Hindman,* for appellants.

*Swarthout & Master,* for appellee.

MOORE, J. This case was tried before a jury. The
charge of the court was somewhat long. We quote
sufficiently from it to indicate the issues involved:

"This action is brought to recover from the defend-
ant certain rents which it is claimed to be due the
plaintiffs by reason of the defendant holding over,
after the expiration of his lease, the premises in con-
troversy. It is claimed by the plaintiffs that a lease
was entered into with the defendant for these premises
to be occupied by him for one year, terminating Sep-
tember 1, 1914, at an agreed rental of $45 per month,
with the additional payment for services rendered by

---

[1]On whether holding over by tenant after expiration of a term
for years constitutes a new and separate term, distinct from that
which preceded or followed, see note in 25 L. R. A. (N. S.) 847.

way of electricity and ice, bills for which were to be separately rendered.

"It is claimed by the plaintiffs that on the expiration of that term, the defendant, without any right or authority, held over and did not vacate the premises until the 30th day of October, whereby under the law a new lease was created at the option of the plaintiff, the landlord, for another period of like duration and like terms as the lease first entered into between the parties. On the other hand, the defendant claims that the lease entered into was to begin October 15, 1913, and was to terminate October 15, 1914, and that about a month prior to the termination of the lease, he entered into an arrangement or agreement by which he was to be permitted to hold over after the termination of the lease and pending the completion and fitting for occupancy of another dwelling which he expected to occupy, and that the holding over under these conditions did not constitute the creation of a new tenancy for a like period and under like terms as contended for by the plaintiff. * * * The defendant claims by this talk with one of the plaintiffs, about September 10, 1914, the plaintiff agreed with him, or led him to believe that he might hold over until November 1st, without obligation to remain longer. Both parties, therefore, claim that the lease, which was verbal, was for one year, the difference between them being as to the date the tenancy was to begin and terminate. It follows, therefore, and I so instruct you as a question of law, that in either event, whether the tenancy began October 15, 1913, or October 1, 1913, the defendant held over beyond the term of his tenancy; the undisputed evidence being that he did not vacate the premises until October 30, 1914.

"I also instruct you as a matter of law that one holding over may be held liable as a tenant for a further period without reference to his actual wishes on the subject. The landlord has the option to treat him as a tenant for a further term, or as a trespasser. The rule is when a tenant holds over after the end of his term, without any new agreement with the landlord, he may be treated in all other respects as holding under the terms of the original lease; the landlord has the election to treat him either as a trespasser or

as a tenant. * * * The tenant has no such election as belongs to the landlord. If he holds over, though for a very short period, that unequivocal act at the time would give his holding the character of a trespasser, and he is not afterwards at liberty to deny that he is in as a tenant, if the landlord chooses to hold him in that relation. * * * Now this situation gives rise substantially to the only questions of fact which you are to consider in this case. * * *

"The first question, then, for you to consider under the evidence in this case is whether a new arrangement, between the defendant and the plaintiff Hoffman, that the defendant might remain over after the expiration of the term of his lease was made as the defendant claims. The plaintiff denies any such agreement or understanding. * * * You have the facts and circumstances before you, the testimony of the witnesses upon this subject, and you must determine from these facts and circumstances and the evidence given by the witnesses as to where the truth lies upon that question. Now, if you fail to find that any such agreement was had between Mr. Hoffman and the defendant, that will end your consideration of this case, for your verdict must be for the plaintiff. On the other hand, if you should find that such an agreement or understanding was had, then you will consider whether or not the defendant relied upon that agreement and formed his plans in reliance thereon in such a way as to result in his injury should that agreement not be carried out by the plaintiff. That raises the question of what, in the law, is termed estoppel. * * * Estoppel arises when something is said or done which was intended to lead, and did lead, the person with whom the party is dealing into a line of conduct which must be prejudicial to his interest unless the party estopped be cut off from the power of retraction. * * *

"The plaintiff contends that, even though you should find that such an agreement was made, still the letter by Mr. Hoffman to the defendant, dated September 26, 1914, was a revocation of any such license or agreement as is now contended for by the defendant. I instruct you that if you find the agreement as claimed by the defendant, and in reliance thereon, the defendant was led to act in such a manner as to change his condition for the worse, unless the agreement should

be carried out, the plaintiff would be estopped from claiming that an agreement was made, and could not retract the authority given to the defendant.   *   *   * And so I say in the first place was such an agreement or understanding had as the defendant claims, and if it was, then you will consider the next question, whether not he was led to rely, and did rely, upon that agreement in such a way that its revocation would result to his injury.   *   *   *   On the other hand, if you should find that he had not relied upon the agreement and had made his plans notwithstanding such agreement, just as he would have made it without it,   *   *   * then the doctrine of estoppel would have no application, and the plaintiff would have the right to revoke any such agreement.   *   *   *

"I have stated to you that the holding over, without any understanding or agreement between the landlord and the tenant for a short period of time, at the option of the landlord, would create a new tenancy.   That is the law, and you are to follow it as the law in this case. On the other hand, I have told you that if it is true, as the defendant claims, that this understanding or agreement was had, that he might hold over without creating a new tenancy, that would be binding upon the plaintiff in this case, unless it was revoked—the question of revocation and the right to revoke will depend upon what you find the facts to be as to the defendant's reliance on such agreement as to whether or not the revocation would leave him in the same situation substantially as he was before the agreement was made. *   *   *   But I have told you that if you should find there was no such agreement made, then that ends the matter, and the plaintiff is entitled to recover, because the doctrine of estoppel rests upon the claim of the defendant that such an understanding and agreement was had.   *   *   *

"If you find for the plaintiff under the instructions, of course your verdict will be for the sum of $339.40, which includes the interest.   There is no dispute as to the amount, if you find for the plaintiff on the claim set forth by the plaintiff in this case before you.

"If you should find for the defendant, it is admitted that the October rent was not paid, and it was not accepted; it was sent by check, and also the incidental expense of the occupancy was sent by check, but the

checks were returned to the defendant, so that amount is still unpaid, and is due the plaintiff in any event. If you should find for the defendant, your verdict will be for $51.98, which is the amount of these two checks. In any event, therefore, your verdict must be for the plaintiffs, for either $339.40 as the plaintiffs claim, or for $51.98 as the defendant claims."

From a verdict and judgment for the plaintiffs of $51.98, the case is brought here by writ of error.

The plaintiffs discuss the errors assigned under seven heads, and cite a number of authorities. The pivotal questions, however, are questions of fact. Did the defendant by reason of remaining in possession of the apartment after the expiration of the year become a tenant by the year as claimed by the plaintiffs, or was there an agreement made that defendant might occupy the premises until November 1st, which would relieve him of any liability after he vacated the premises October 30th, as he claims?

The testimony cannot be reconciled. The defendant testified in part as follows:

"I am the pastor of the First Methodist Church of this city. I arrived here September 27, 1913. I found that the church had no parsonage, but my predecessor had been living in a house standing on the ground where they proposed to build the new church that they are now constructing. * * * Up to that time I had not seen Mr. Hoffman. The next day, October 7th, I went through the apartment and met Mr. Hoffman for the first time. I told him who I was and what I wanted, and that I would be here in the apartment for a year, and I would like to rent it with the privilege of extending the lease of it two or three years if we wanted to stay that long, * * * and he said we could make out a lease subject to renewal, and he told me that the rental value would be $45 a month. * * * He said he would have the apartment put in order for me as soon as he could, and he did. We moved into the apartment October 15, 1913. * * * All the talk we had in regard to the lease and the amount of the rent was on October 7th. $540 was

not mentioned, the rental value was fixed at $45 a month, and the total was never mentioned, and nothing was said in regard to the time when the lease should begin. * * * I asked him as to the contract, etc., and he said he would prepare a written lease, and would have it ready to sign when I moved in there. I paid the first rent by check November 3, 1913. * * * During the latter part of August, 1914, I found it was necessary for me to go on a business trip in northwestern Canada some time during the first part of October, and, knowing that my year would be out on the 15th of October, I was afraid I would not get back before the year would close. and so I went to see Mr. Hoffman as to what adjustment we might make, and also then I began to feel that the parsonage would not be ready for occupancy before the 1st of November, or perhaps the middle of it, as it proved to be, and some time between the 1st of September and the 10th of September I saw Mr. Hoffman and had this conversation with him, * * * and I then told Mr. Hoffman that the parsonage deal had gotten farther along than I supposed it would the year before, and yet not as far as I had hoped it would be, as they would not have completed it—the parsonage was not so we could move into it about the middle of October, when my lease expired, and that I would like the privilege of staying there until the 1st of November, or possibly the middle of November, and also that I was going away about the 1st of October to be gone on business in northwest Canada, and I wanted to know that my wife and daughter would not be troubled about the moving part, and Mr. Hoffman said to me: 'That is all right, Mr. Willits. There will be no trouble about that.' And I took it and understood that I could stay until the 1st of November. * * * In this conversation Mr. Hoffman did not say anything to me about the lease expiring on September 30th. He did not say that if I stayed by the 1st of October, he would hold me for another year's rent. He did not make any demand on me at any time up to the time I left the city, indicating that he intended to try to hold me after October 1st."

On the cross-examination he said:

"*A.* I had no other conversation with Mr. Hoffman

or Mr. Hindman other than the conversation on the
street some time in the morning between the 1st of
September and September 10th, in which he gave me
to understand clearly that I had a right to stay."

Mr. Hoffman denies that any such agreement was
made in September as stated by defendant. The fol-
lowing appears in his cross-examination:

"The first indication I had that Dr. Willits expected
to move out was when he overtook me one day on the
street near the flats some time in the middle of Sep-
tember, as I remember it, and as I remember it he said
that it looked as if they were going to have the par-
sonage ready for him sooner than he had anticipated,
and that he, no doubt, would move some time in Octo-
ber. I do not remember of his asking me anything.
I said but very little. I was kind of surprised, and
I told him that I would think it over and see about it,
or something of that sort. After that I wrote him a
letter on the 26th. In this conversation I did not say
anything to him in regard to the time when the lease
began. That subject was not canvassed in the con-
versation. In that conversation I did not tell him that
the lease expired September 30th, and he did not say
anything about the lease expiring at that time. Noth-
ing was said in the conversation as to the time when
the lease began or when it expired. He did tell me
that the church was getting the parsonage ready, and
that he would get in it sooner than he had planned,
something to that effect. He said nothing definite as
to the date when he would move out of the apartment.

"*Q.* Did he ask you whether he might stay in over
the term?

"*A.* Why he inferred that in his conversation as to
whether—

"*Q.* That was the purpose of the conversation, to
get your consent?

"*A.* I suppose so. He met me in the building, and
I walked up the street with him.

"*Q.* And he did not ask you if he might stay in after
the lease expired?

"*A.* No; he did not put it that strong.

"*Q.* And didn't you reply or say to him that that

would be all right, or words to that effect; you would be glad to have him stay?

"*A.* I did not.

"*Q.* Did you not give him to understand at that time, in that conversation, that he might stay after the lease expired for a short time until they got the parsonage ready, without renewing his lease?

"*A.* I did not.

"*Q.* Did he not so understand from the conversation?

"*A.* I don't know what he understood.  *  *  *  I wrote this letter of September 26th, because I previously had that talk with him on the street. I knew from that conversation along in the middle of September that he did intend to move some time, and that the reason was that the church was getting the parsonage ready."

In *Scott* v. *Beecher*, 91 Mich. 590 (52 N. W. 20), the following appears:

"No notice was necessary to terminate the tenancy which had existed prior to May, 1890, on the part of either landlord or tenant. The law presumes an intention by the tenant to continue the yearly tenancy from the holding over. An agreement that such holding over should not be so regarded might be shown to rebut the presumption, or there might be such clear indications of an intention to vacate that a holding over for a day would not support the presumption."

In *Campau* v. *Michell*, 103 Mich. 617 (61 N. W. 890), the above language is quoted with approval. Justice LONG, speaking for the court, further said:

"It remains to be seen, therefore, whether the holding over of the subtenant in the present case, and under the circumstances shown by the facts found, can be construed as an election by the tenant to continue the time for another term. His term expired on April 30th. On March 28th, the tenant wrote the subtenant that the term would expire on May 1st, and that he did not desire to renew the lease. April 23d or 24th the subtenant commenced packing and shipping his goods, intending to vacate May 1st. April 30th was Saturday. On Monday, May 2d, he prepared to move the

goods from the store. On the morning of that day, plaintiff's agent entered, and took down the sign: 'To rent. Apply to Alexander M. Campau.' He saw that the subtenant was about to move out. The subtenant asked him why he removed the sign, and he said the store had been rented to Michell; and the subtenant, relying upon this, and thinking that Michell did not want immediate possession, delayed the removal for several days. Defendant knew nothing of this until May 5th, when plaintiff called upon him for rent. Defendant at once notified the subtenant, who moved out. It is evident that, had the subtenant moved out on Monday, it would have been in time to save any question of holding over. That he did not move at that time appears to have been due to the action of the plaintiff's agent, who led the subtenant to believe that Michell had renewed the lease. * * * We think in this case the facts found by the court below show very clearly the intent of the subtenant to vacate, and that he would have vacated but for the interposition of plaintiff's agent. If the landlord should be permitted to prevail under these circumstances, it would be permitting him to have advantage of the wrongful acts of his own agent. *Adler* v. *Mendelson*, 74 Wis. 464 (43 N. W. 505)."

See, also, *Landsberg* v. *Brewing Co.*, 132 Mich. 651 (94 N. W. 197).

In *Luger* v. *Goerke*, 18 App. Div. 291 (45 N. Y. Supp. 839), it is said:

"The suggestion that the defendant should remain after the year expired appears to have proceeded from the plaintiff himself when he asked for the $500 in June; for that sum represented the rent for five months, a period which would not terminate until the end of September. The defendant's holding over under such circumstances was in no sense tortious. His situation was merely that of a tenant who, before the expiration of his original lease, had hired the leased property for an additional month, and had paid the rent for it, and had thereby become entitled to occupy it. His continued occupation was thus in pursuance of a contract with his landlord, and was not of a character which gave the latter any option to treat him as

otherwise than rightfully in possession. The rule of law which makes a lessee liable for an additional year where he holds over after the expiration of his term is based upon the assumption that the holding over is wrongful, so that the landlord may either treat him as a trespasser or take him as a tenant. *Schuyler* v. *Smith,* 51 N. Y. 309 (10 Am. Rep. 609) ; *Adams* v. *City of Cohoes,* 127 N. Y. 175, 182 (28 N. E. 25) ; *Wood* v. *Gordon* (Com. Pl.), 18 N. Y. Supp. 109. It has no application where, as in the case of *Pickett* v. *Bartlett,* 107 N. Y. 277 (14 N. E. 301), the parties anticipated a holding by the tenant beyond the term, and provided for it by agreement. In the case at bar the parties manifested such an agreement by accepting and paying the September rent in June. At least the trial court was authorized so to find, even if the proof did not demand the conclusion that the holding over was with the landlord's consent."

See, also, *Montgomery* v. *Willis,* 45 Neb. 434 (63 N. W. 794) ; *Puckett* v. *Scott,* 45 Tex. Civ. App. 392 (100 S. W. 969) ; *Leggett* v. *Exposition Co.,* 157 Mo. App. 108 (137 S. W. 893).

If the facts are as stated by the defendant and the jury by their verdict have so found, the case, under these authorities, should be affirmed.

Judgment is affirmed, with costs to defendant.

STONE, C. J., and KUHN, OSTRANDER, BIRD, STEERE, and BROOKE, JJ., concurred. PERSON, J., did not sit.